THE STATE OF OHIO, APPELLEE, *v.* HILL, APPELLANT.

[Cite as State v. Hill (1963), 40 Ohio App. 2d 16.]

(No. 2721—Decided April 3, 1963.)

*Mr. Louis I. Hoffman,* for appellee.
*Mr. Theodore M. Arnovitz,* for appellant.

SHERER, J. The defendant was tried on three counts of forgery by the Common Pleas Court of Montgomery County without a jury and found guilty by the court on two counts.

The only error assigned and argued in this court is that the court erred to the prejudice of the defendant (1) in admitting, over defendant's objection, a written stipulation signed by the prosecution and the defendant, wherein it was agreed that defendant was to submit to a "lie detector test" and that the result was to be admitted in evidence, and (2) in permitting the operator of the machine to state his opinions as to the truthfulness of defendant's answers to questions asked during the test.

It is agreed that the parties entered into such stipulation before the trial and that the parties herein agreed that the examiner was qualified for the purpose of determining whether or not the defendant committed the offenses charged.

The record discloses that counsel for defendant, in his

opening statements to the court, evinced an intention to repudiate his agreement and to object to the admissibility of the stipulation and the opinions of the examiner, if offered in evidence. This was understood by the trial court. The record shows that the stipulation was admitted as evidence over the objection of counsel for defendant, and the examiner was permitted, over the objection of counsel for defendant, to state his opinion as to the truth of the matters related by defendant to the examiner concerning his involvement in the alleged offenses.

The precise question involved here has not been determined by our Supreme Court or by any Court of Appeals in this state. We have examined the cases cited by counsel and, as is to be expected in matters of this kind, find the courts divided. All begin with a consideration of the case of *Frye* v. *United States* (D. C. Cir.), 293 F. 1013. In that case, the syllabus states:

"The systolic blood pressure deception test, based on the theory that truth is spontaneous and comes without conscious effort, which is reflected in the blood pressure, *held* not to have such a scientific recognition among psychological and physiological authorities as would justify the courts in admitting expert testimony on defendant's behalf, deduced from experiments thus far made."

"While the courts will go a long way in admitting expert testimony, deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

No appellate court in this country has admitted the results of a polygraph test in evidence in the absence of a stipulation. Many, if not all, of the reported cases bearing upon the question here involved have been expertly summed up by the Supreme Court of Arizona, May 23, 1962, in the case of *Arizona* v. *Valdez*, 91 Ariz. 274, 371 P. 2d 894. The headnotes in 371 P. 2d 894 state:

"Although absolute infallibility is not the standard for admissibility of scientific evidence, greater standardization of the instrument, technique and examiner qualifica-

tions and endorsement by larger segment of the psychology and physiology branches of science must be obtained before permitting general use of lie-detector evidence in court, and hence in absence of a stipulation lie-detector evidence should not be received.''

''Although much remains to be done to perfect lie detector as a means of determining credibility, it has developed to a state in which its results are probative enough to warrant admissibility upon stipulation and hence, subject to certain qualifications, polygraphs and expert testimony relating thereto are admissible upon stipulation in criminal cases, and to corroborate other evidence of defendant's participation in crime charged, and if defendant testifies, such evidence is admissible to corroborate or impeach his own testimony.''

''To render polygraphs and expert testimony relating thereto admissible upon stipulation, county attorney, defendant and his counsel must all sign the written stipulation providing for defendant's submission to the test and for subsequent admission at trial of graphs and examiner's opinion thereon on behalf of either defendant or the state.''

''Notwithstanding stipulation, admissibility of lie-detector test results is subject to discretion of trial judge, that is, if trial judge is not convinced that examiner is qualified or that test was conducted under proper conditions he may refuse to accept such evidence.''

''If lie-detector testimony is offered in evidence pursuant to stipulation, opposing party must have right to cross-examine the examiner regarding (a) examiner's qualifications and training, (b) conditions under which test was administered, (c) limitations of and possibilities for error in technique of polygraphic interrogation, and (d) at discretion of trial judge, any other matter deemed pertinent to the inquiry.''

''If lie-detector evidence is admitted pursuant to stipulation, trial judge should instruct jury that examiner's testimony does not tend to prove or disprove any element of crime with which a defendant is charged but at most tends only to indicate that at time of examination defend-

ant was not telling the truth, and court should also instruct that it is for jury to determine what corroborative weight and effect such testimony should be given.''

The Supreme Court of Michigan, in *Stone* v. *Earp,* 331 Mich. 606, 50 N. W. 2d 172, held to the contrary, saying at 611, 50 N. W. 2d at 174:

''We are not unmindful of the fact that at the direction of the trial court, the parties agreed to submit to the tests, but whether by voluntary agreement, court direction, or coercion, the results of such tests do not attain the stature of competent evidence.''

In *State* v. *Bohner,* 210 Wis. 651, 246 N. W. 314, and in *LeFevre* v. *State,* 8 N. W. 2d 288, the Supreme Court of Wisconsin came to the same conclusion. In *State* v. *Trimble,* 68 N. M. 406, 362 P. 2d 783, the Supreme Court of New Mexico held likewise. In the *Bohner* case, the court said at 658, 246 N. W. at 317:

''The present necessity for elaborate exposition of its theory and demonstration of its practical working in order to convince the jury of its probative tendencies, together with the possibility of attacks upon the soundness of its underlying theory and its practical usefulness, may easily result in a trial of the lie detector rather than the issues in the cause.''

In *Commonwealth* v. *McKinley,* 118 Pa. Super. 610, 123 A. 2d 735, it is said that the reason most commonly assigned for the exclusion of such evidence is the contention that the lie detector has not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception. Headnote 13 of 123 A. 2d 735 states:

''In view of fact that results of lie detector tests are inadmissible and precluded from consideration by jury because unwarranted inferences are likely to be drawn as to guilt or innocence of one accused of crime, mere offer or refusal to undergo such test is also properly excluded from jury's consideration for the same reason.''

In 24 Fed. Probation 36, Richard O. Arthur, Director of Scientific Lie Detector Inc., N. Y. City, in 1960, said:

''It is only as reliable and valuable as the examiner. It

must be remembered that there are few truly competent examiners—the results can be interpreted only by an expert.''

The court in *State of Arizona* v. *Valdez, supra,* at 283, 371 P. 2d at 900, said:

''Although much remains to be done to perfect the lie-detector as a means of determining credibility we think it has been developed to a state in which its results are probative enough to warrant admissibility upon stipulation.''

This case also points out, at pages 897 and 898, the scientific objections to the acceptance of the use of this technique in the diagnosis of deception.

In *Henderson* v. *State*, 94 Okla. Crim. 45, 230 P. 2d 495, the Criminal Court of Appeals of Oklahoma discussed lie detector tests and some of the cases in other courts which dealt with the subject, including *State* v. *Lowry*, 163 Kan. 622, 185 P. 2d 147, 150.

Quoting from the *Lowry* case, the court stated the following, at 53, 230 P. 2d at 504:

''The practical effect of the admission of this testimony was to constitute a mechanical device—as reported by the operator—a sort of witness in absentia on the question of the defendant's guilt or innocence.

''In no case cited by appellee or found in our own research has a court of last resort sanctioned the admission of such testimony. Nor has any trial court, as far as we are aware, admitted testimony, over objection, as to the result of such tests upon a complaining witness. The ultimate, logical result of doing so would be to have such tests made upon all witnesses for the purpose of helping the jury determine their credibility.

''Cogent reasons in support of this attitude of the courts readily suggest themselves. In the first place, the vital function of cross-examination would be impaired. The operator, appearing as a witness to report and interpret the results of the test, might be questioned as to his qualifications, experience, his methods, and on similar matters, and that is about all. But the machine itself—conceding the comparatively high percentage record as to accuracy and

reliability claimed for it—escapes all cross-examination. There is no persuasive analogy here with such tests as fingerprinting which have a strictly physical basis, clearly demonstrable. It is not contended that the lie detector measures or weighs the important psychological factors. Many innocent but highly sensitive persons, would undoubtedly show unfavorable physical reactions, while many guilty persons, of hardened or less sensitive spirit, would register no physical indication of falsification. This the trained operators of course understand, and proceed upon the basis of a large percentage of error. But it seems quite too subtle a task of evaluation to impose upon an untrained jury.''

" 'First, a party might produce only those tests which were favorable to himself, and his opponent would not be able to examine him under the lie-detector, nor to cross-examine him should he refuse to take the stand. Second, it would be difficult for the opposing counsel to expose an incompetent or dishonest expert and to cross-examine him concerning the tests, because the lie-detector is not adquately standardized as to instrument, manner of conducting tests, qualifications of examiners, and interpretation of the records. [29 Cornell L. Q. 535 (1944).]' ''

The court in *Henderson*, at 54, 230 P. 2d at 505, quotes Fred Inbau, professor of law at Northwestern University, an associate of Dr. Keeler, who is credited with having perfected the polygraph, as admitting that the tests have " 'not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made. [Boston U. L. R. (Apr. 1946).]' ''

In a comparatively recent work, Lie Detection and Criminal Interrogation (2 Ed. 1948), Professor Inbau states that the factors which occasion the chief difficulties in the diagnosis of deception by the lie detector technique are: (1) nervousness experienced by a subject who is innocent and telling the truth regarding the offense in question but who is nevertheless affected by fear induced by the mere

fact that suspicion or accusation has been directed against him, and particularly so in instances where the subject has been extensively interrogated or perhaps physically abused by investigators prior to the time of the interview and testing by lie detector examiner; (2) physiological abnormalities such as excessively high or excessively low blood pressure, diseases of the heart and respiratory disorders; (3) mental abnormalities, such as feeble mindedness, psychoses or insanities and psychoneuroses and psychopathia as among so-called "peculiar" or "emotionally unstable persons," unresponsiveness in a lying or guilty subject because of lack of fear of detection, apparent ability to consciously control responses by means of certain mental sets of attitudes, a condition of "sub shock" or adrenal exhaustion at the time of the test, rationalization of the crime in advance of the test to such an extent that lying about the offense arouses little or no emotional disturbance and unopposed muscular response which produces ambiguousness or misleading indications in the blood pressure tracing. *The possibility that one who is innocent might react as one guilty because of fear is particularly persuasive with us.* It is argued that the margin of error in the use of the apparatus is small. That may be true where tests were made by recognized experts but it is not safe to say that such would be the case if every police department in the country should send one or two officers to a training institute for thirty days and then proclaim them to be experts. We believe that the cause of justice is best served by proceeding with extreme caution in such a doubtful area—that it is better that a few of the guilty escape their just deserts than to put to death *one* who is innocent.

In Ohio, R. C. 2945.03 imposes a positive duty upon the trial court in a criminal case to control all proceedings therein and to limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue. The terms "relevant" and "material" were defined in *Weinstock* v. *United States* (D. C. Cir.), 231 F. 2d 699, 701.

Headnote 3 of that case states:

"As used in respect to evidence, 'material' has wholly different meaning from 'relevant'; and 'relevant' means to relate to the issue, while 'material' means to have probative weight that is reasonably likely to influence tribunal in making determination required to be made."

Our Supreme Court, in *Barnett* v. *State*, 104 Ohio St. 298, 306, quotes two definitions of "relevant" evidence as follows:

"Any matter of fact, the effect, tendency, or design of which, when presented to the mind, is to produce a persuasion concerning the existence of some other matter of fact—a persuasion either affirmative or dis-affirmative of its existence."

"All the means by which any alleged matter of fact, the truth of which is submitted to investigation, is established or disproved."

In *Whiteman* v. *State*, 119 Ohio St. 285, the court said at 288:

"It has been said that relevancy is that which conduces to the proof of a pertinent hypothesis. Again, it is said that the word 'relevant,' as applied to the admission of evidence, means that any two facts to which it is applied are so related to each other that according to the common course of events one of them, taken by itself or in connection with other facts, proves or renders probable the past, present or future existence or nonexistence of the other."

We conclude that the results of a lie detector test do not constitute "relevant" and "material" evidence within the meaning of R. C. 2945.03. We do not consider it logical and reasonable to hold, as in the Arizona case, *supra,* that such evidence has probative value when offered under a stipulation that it may be received, but that it has no probative value without such stipulation.

We conclude that the action of the trial court admitting, over defendant's objections, the results of a lie detector test was erroneous for the following reasons:

(1) The defendant withdrew his consent to the introduction of such evidence at the outset of the trial before any evidence was taken.

(2) There was no showing that the police officer who

24

conducted the test was qualified to give the test and interpret the results.

(3) There is no showing that psychological and physiological authorities have accorded scientific recognition to such tests as a reliable and accurate means of ascertaining truth or deception.

(4) The results of the tests and the opinion of the operator of the machine are not relevant and material to the issues in the case and are not admissible even with a stipulation such as is claimed here.

(5) The submission of the stipulation to the court constitutes an unwarranted interference with the duty of the trial court as set forth in R. C. 2945.03.

It appears to us that the submission of the results of such a test and the opinion of the operator of the machine under a stipulation which admits the qualifications of the operator to conduct the test and interpret the results, as a sort of "short form" process, deprives the trial court and the jury, in a jury case, of any real appreciation of the probative value of the test, if any. Even though an accused and the prosecution be willing to take their chances with it and the court approves, yet the jury is apt to be misled and confused. The people of this state have rights in a criminal case that should not be bartered away via a stipulation that assigns probative value to evidence which in reality has none because the scientific experts have not yet accepted it as a reliable and accurate means of ascertaining truth or deception.

While we believe that the trial court erred as we have set forth, we do not consider the error prejudicial. We have carefully examined the record here and conclude that the other evidence establishes the guilt of the defendant beyond a reasonable doubt and to a moral certainty. The judgment of the common pleas court will, therefore, be affirmed. R. C. 2945.83, *State* v. *Phillips,* 90 Ohio App. 44.

*Judgment affirmed.*

CRAWFORD, J., concurs.

KERNS, P. J., concurring in judgment only. Prior to the trial of this case, the defendant, the appellant herein, his counsel, and the prosecuting attorney stipulated as follows:

"It is hereby mutually agreed by and between the Defendant Herbert Lee Hill, alias L. C. Barnes, alias Karl K. Lorenz and his Counsel of Record and the Prosecuting Attorney of Montgomery County, Ohio, that the Defendant shall submit to a polygraph (lie detector) examination to be given on the 20th day of February, 1962, by Examiner Det. Jack Reay, of the Dayton Police Department, who is admitted by this Agreement of Stipulation to be a qualified Examiner, for the purpose of determining, in the Examiner's opinion, whether or not the Defendant did on or about the 30th day of June, 1962 commit the offense of Forgery.

"It is further agreed and stipulated that the results of the polygraph examination, in the form of an opinion by the Examiner, may be offered in evidence on behalf of the Defendant or on behalf of the State. In presenting his opinion, the Examiner may exhibit and explain to the Court and jury the various recordings obtained as part of the test procedure. He may also describe the instrument used, explain the nature of the test, and state the reasons which form the basis for his opinion that the defendant is or is not telling the truth about the offense.

"If the test results and the Examiner's opinion are offered as evidence by either party to this agreement and stipulation, the opposing party shall have the right to cross-examine the Examiner with respect to the manner in which he conducted the test, his own training and experience, and also regarding the polygraph techniques, and its limitations.

"If trial by jury, the Court shall be requested to instruct the jury regarding the terms of this agreement and stipulation. Also the Court shall be requested to instruct the jury that they should not except the test results and the Examiner's opinion as conclusive of the issue before them, but they are privileged to consider the results and the Examiner's opinion along with all the other evidence in the case

and to give the polygraph evidence whatever weight and effect they think it reasonably deserves.

"In consenting to the polygraph examination, the Defendant by his signature below states that he has read this Agreement of Stipulation, that he has consulted with his Counsel of Record concerning the contents thereof and further that he knows and understands that he is under no legal compulsion to take this examination but does so freely and voluntarily. Agreed and stipulated this 7th day of February, 1962.

> "/S/ Herbert L. Hill
> Defendant
> /S/ Theodore M. Arnovitz
> Attorney for Defendant

"Paul R. Young
Prosecuting Attorney
By /S/ Keith A. Saeks
     Assistant"

Pursuant to the agreement, the defendant submitted to a polygraph examination.

At the trial, the stipulation, as well as testimony relating to the polygraph examination and the results thereof, was admitted into evidence over the objection of defense counsel.

The sole issue presented in this appeal is whether the trial court committed prejudicial error in admitting into evidence the results of a polygraph examination, which had been stipulated by the defendant and his counsel as being admissible at the trial.

The first reported case in the United States involving the admissibility of lie-detector evidence was *Frye* v. *United States* (D. C. Cir. 1923), 293 F. 1013, 34 A. L. R. 145.

In upholding the trial court's refusal to admit the results of a deception test, the court, in the *Frye* case, made the following observation at 1014:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and

while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

"We think the systolic blood-pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made."

Although the scientific reliability of polygraphic interrogation has increased substantially since the *Frye* case was decided, in 1923, the judicial attitude toward the admissibility of lie-detector evidence, in the absence of a stipulation or agreement by the parties, has experienced no perceivable change since that time. Without noticeable exception, the prevailing authorities have been consistent in refusing to admit into evidence, directly or indirectly, the results of a lie-detector test. 23 A. L. R. 2d 1308. See, also, *State* v. *Smith*, 113 Ohio App. 461; *Parker* v. *Friendt*, 99 Ohio App. 329.

In more recent years, however, some courts have refused to apply the rule where the parties themselves have stipulated that the results of a polygraph examination shall be admitted into evidence.

In the case of *People* v. *Houser*, 85 Cal. App. 2d 686, 193 P. 2d 937, the court admitted lie-detector evidence pursuant to a written stipulation. In that case, at page 695, 193 P. 2d at 942, the court said:

"It would be difficult to hold that defendant should now be permitted on this appeal to take advantage of any claim that such operator was not an expert and that as to the results of the test such evidence was inadmissible, merely because it happened to indicate that he was not telling the truth * * *."

In the case of *State* v. *McNamara*, 252 Iowa 19, 104 N. W. 2d 568, the Supreme Court of Iowa, in affirming a second degree murder conviction, held that lie-detector evi-

dence was admissible pursuant to agreement. Headnote 10 of 104 N. W. 2d 568, states:

"Where, after negotiations between defendant's counsel and county attorney, defendant in writing agreed to submit to a polygraph or lie detector test and agreed that examiner could testify in court as to result of test, the lie detector test evidence was admissible in homicide prosecution against defendant."

The Supreme Court of Arizona reached a similar conclusion in the case of State v. Valdez, 91 Ariz. 274, 371 P. 2d 894, where the court said, at 283, 371 P. 2d at 900:

"* * * subject to the qualifications announced herein, we hold that polygraphs and expert testimony relating thereto are admissible upon stipulation in Arizona criminal cases."

In addition to the express holdings of the aforementioned authorities, lie-detector evidence by stipulation has been sanctioned by implication in the following cases: Parker v. Friendt, 99 Ohio App. 329; State v. Lowry, 163 Kan. 622, 185 P. 2d 147; State v. Armvine, 67 N. J. Super. 483, 171 A. 2d 124; Colbert v. Commonwealth, 306 S. W. 2d 825, 71 A. L. R. 2d 442; Commonwealth v. McKinley, 181 Pa. Super 610, 123 A. 2d 735.

The cases are not unanimous, however, in holding that lie-detector evidence is admissible pursuant to stipulation. See LeFevre v. State, 242 Wis. 416, 8 N. W. 2d 288; Stone v. Earp, 331 Mich. 606, 50 N. W. 2d 172; State v. Trimble, 68 N. M. 406, 362 P. 2d 788.

Apparently, no appellate court in Ohio has decided the question presented in this case, but, unlike the majority of this court, I fail to observe how any fundamental right of the defendant was invaded by honoring his voluntary stipulation.

In weighing the merits of any scientific evidence, infallibility is obviously not the test of admissibility. Were it otherwise, those responsible for determining factual questions in many criminal trials would be relegated to a completely vacuous position.

In its present stage of development, the margin of

proven error in the use of the lie-detector is five per cent or less. This being so, it is difficult to envision rightfully accused criminal defendants clamoring to submit to an examination or to have the results of such an examination admitted into evidence. On the other hand, it would be extremely harsh to deny a wrongfully accused criminal defendant any reasonable means of proclaiming his innocence. Parenthetically, it is interesting to note at this juncture that in the classic *Frye* case, *supra,* where evidence of truthfulness was excluded, an innocent person was convicted of second degree murder.

Undoubtedly, the most challenging of all arguments in favor of admitting lie-detector evidence is that invoked on behalf of an accused demanding such evidence to prove his innocence, and this argument becomes even more compelling when weighed against the mere theoretical possibility that the absence of any lie-detector evidence at the trial of some future case might give rise to an unjustifiable inference of guilt. The majority opinion expresses particular concern over "the possibility that one who is innocent might react as one guilty because of fear." However, until some perfect method of determining guilt or innocence, and truth or deception is devised, the law must, of necessity, deal with probabilities rather than possibilities. And in any event, the polygraph examiner is subject to cross-examination concerning the possibilities incident to the use of the lie detector.

In the three aforementioned cases, which hold that polygraph evidence is not admissible pursuant to stipulation, the courts relied exclusively upon the rule of the *Frye* case, and in so doing appear to have accorded to that rule greater and more lasting veneration than the language of the opinion in the case indicates was expected or anticipated. Based upon present standards of reliability, we should not share the reluctance of those courts to admit such evidence where the defendant, in the exercise of his own judgment, requests the examination and agrees that the results thereof may be admitted as evidence. In this regard, it is significant, perhaps, that defendants in crimi-

nal cases are commonly permitted to waive certain rights which are more fundamental, more specifically guaranteed, and more jealously guarded by law than any rule of evidence.

Accordingly, and subject to the following qualifications, polygraph evidence should, in my opinion, be admissible by stipulation in criminal cases:

(1) if the evidence is admitted pursuant to a written stipulation signed by the prosecuting attorney and by both the defendant and defendant's counsel;

(2) if the stipulation contains a specific agreement upon the party or parties who will conduct the examination; and

(3) if the trial court, in the exercise of its discretion, is satisfied with the qualifications of the party or parties who conducted the examination.

These requirements were met in the present case. For this reason, therefore, the judgment was properly affirmed.